**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**R. MILLER ARCHITECTURE,**
**INC.,** a Florida corporation**,**

        **Plaintiff,**

**vs.**                      **Case No. 6:06-cv-871-Orl-19DAB**

**EDGINGTON ENTERPRISES,**
**INC.,** a Florida corporation**,**
**EDGINGTON CONSTRUCTION**
**CO.,** d/b/a **EDGINGTON**
**ENTERPRISES, INC., PHILIP A.**
**EDGINGTON, ANDREA C.**
**EDGINGTON, ADAM EDGINGTON,**
**LAUREN EDGINGTON, LILDON**
**ENGINEERING CO., INC.,** a Florida
corporation, and **WAYNE BLOCK,**

        **Defendants.**
_____

## ORDER

This case comes before the Court on the following:

1.      Motion for Preliminary Injunction, filed by Plaintiff R. Miller Architecture

           on June 26, 2006; (Doc. No. 2);

2.      Affidavit of Robert Miller in Support of Plaintiff's Motion for Preliminary

           Injunction, filed by Plaintiff on June 26, 2006; (Doc. No. 3);

3.      Memorandum in Support of Plaintiff's Motion for Preliminary Injunction,

           filed by Plaintiff on June 26, 2006; (Doc. No. 4);

4.      Plaintiff's Notice of Filing Supplemental Affidavit of Robert Miller in Support of Plaintiff's Motion for Preliminary Injunction, filed by Plaintiff on July 20, 2006; (Doc. No. 29);

5.      Defendants [sic] Response to Plaintiff's Motion for Preliminary Injunction and Memorandum of Law, filed by Defendants Edgington Enterprises, Inc., Edgington Construction Co. d/b/a Edgington Enterprises, Inc., Philip A. Edgington, Andrea C. Edgington, Adam Edgington, and Lauren Edgington, on July 24, 2006; (Doc. No. 35); and

6.      Notice of Filing Affidavit of Philip A. Edgington, filed by Defendants on July 24, 2006.  (Doc. No. 36).

## Background

The instant dispute arises out of continued use by Edgington Enterprises, Inc. And Edgington Construction Co. ("Edgington") of architectural plans authored by Plaintiff R. Miller Architecture, Inc. ("Miller")[1] in constructing a 158-unit residential townhouse community in Clermont, Florida.  Miller seeks a preliminary injunction enjoining Edgington from constructing any structure based upon its designs, from calling in any inspections or requesting any certificate of occupancy on a unit based on its  designs, and from releasing or distributing any profits generated from the sale of any townhouse constructed using its

---

[1]      The record reveals that during the time period in question, Robert Miller operated a sole proprietorship by the name of "R. Miller Architecture," which apparently was later incorporated into the current Plaintiff, R. Miller Architecture, Inc.  As Robert Miller is the principal of both organizations, and as the sole proprietorship has assigned its interest in the copyrighted designs to the current Plaintiff, the Court will refer to both organizations as "Miller" for purposes of simplicity.  (*See, e.g.,* Doc. No. 1-15, 1-16, filed on June 26, 2006).

designs.  (*See* Doc. No. 2, pp. 1-2).  Edgington opposes the entry of a preliminary injunction and denies any wrongdoing.  For the reasons that follow, the Court denies the request for preliminary injunctive relief.

In August of 1999, Edgington hired Miller to prepare designs and do other architectural work for a project entitled "The Clermont Yacht Club," a residential community Defendant was constructing in Clermont, Florida.  (*See, e.g.,* Doc. No. 3 at p. 2). At that time, Robert Miller, the principal of Miller, and Philip Edgington, the principal of Edgington, were friends who had worked together on a previous project, and thus the agreement between them for work on The Clermont Yacht Club was an informal arrangement not reduced to writing.  (*See, e.g., id.*).  Over the next eight (8) months, Miller authored seven (7) different designs and three (3) different roof elevations with the intention that Edgington use the designs in The Clermont Yacht Club project.  (*See, e.g., id.* at p. 3).

In April of 2000, Edgington became concerned that Miller's fees were exceeding its budget and asked Miller to provide an estimate of future fees.  (*See, e.g., id.* at pp. 3-4; Doc. No. 35-1 at p. 4).  On May 5, 2000, Miller faxed Edgington a "fee study" which included fees for the preparation of plans for all seven designs and all three roof elevations. Ultimately, however, Edgington decided to employ Miller on a more limited basis, and all bills submitted by Miller were paid on a per-hour rate.  (*See, e.g.,* Doc. No. 35-1, p. 4; Doc. No. 1-6).  This is reflected by the meeting minutes prepared by Robert Miller after a May 15, 2000 meeting in which the parties agreed on a future course of action.  First, the parties agreed that Edgington was going to attempt to get building permits based on Miller's previously-completed standard-unit plans and the site plan.  Next, Edgington retained Miller

to finish building several model townhomes so future permits would be easier to obtain. After this, the parties agreed that Edgington "would call RMA [Miller] on an as-needed basis to get permits." (*See, e.g.,* Doc. No. 1-6). Robert Miller states that it was clear from this meeting that he "would be consulted and would perform additional services in the future to address the refinement of the design required in the course of developing and constructing the remaining townhouse units." (Doc. No. 3, ¶ 11).

On May 22, 2000, Miller sent Edgington revised marketing plans, and Edgington requested that Miller provide it with several items needed to start pre-sales work, including roof styles and floor plans. (*See* Doc. Nos. 35-3, 35-4). Edgington claims that print advertisements which shortly followed used, with Miller's knowledge and consent, the revised marketing plans prepared by Miller. It was also in May that Edgington began to experience severe financial troubles regarding The Clermont Yacht Club project. After completing construction drawings for the first five-unit townhouse building in June of 2000, Miller informally suspended its services and performed only minimal work for the next year. (*See* Doc. No. 3, p. 5). Edgington claims that at no time between 2001 and 2006 did Miller inform it that further use of Miller's designs was not permitted or would constitute copyright infringement. (*See, e.g.,* Doc. No. 36-2, ¶ 16). Further, Edgington claims that a July 12, 2000 letter from Robert Miller congratulating it on the sale of the model units and on reservations for future units is further evidence of Miller's implicit approval of Edgington continuing to use its designs. (Doc. No. 36-2, ¶ 11).

Miller alleges that after it disassociated itself from The Clermont Yacht Club project in mid-2000, Edgington entered into an unlawful scheme to misappropriate Miller's design

work in order to be able to continue using these designs without having to pay Miller or another architect the fees which it likely knew it would have to pay after Miller submitted its "fee study." (*See, e.g,* Doc. No. 3, pp. 6-7). The scheme allegedly called for Lildon Engineering and Wayne Block, co-defendants, to sign, seal, and reproduce Miller's plans, including some with derivative changes made to them in order to lower development and construction fees. (*See, e.g., id.* at pp. 7-8). Miller argues that not only do these acts constitute copyright infringement, but also they expose Miller as architect of record to potential future lawsuits and claims by third parties. (*See, e.g., id.* at p. 9).

In August of 2001, Miller filed a lien against The Clermont Yacht Club townhouses, owned by Edgington Enterprises, Inc., for the unpaid balance of its fees. Miller filed an amended lien in September of the same year. (Doc. Nos. 35-8, 35-9). Edgington argues that Miller was not only fully aware at this time that Edgington was using Miller's plans for construction of the remaining 153 townhomes, but also this was the reason Miller filed an amended lien. (Doc. No. 36-2, p. 6). Edgington suggests that further evidence of Miller's consent is the fact that Miller changed the lien to a mortgage on the site to allow construction of the townhouses to be completed. (*See id.*). In addition, Edgington states that on September 13, 2001, several days after the parties' discussion regarding changing the lien to a mortgage, Robert Miller rode and walked the property and observed at least two units not contained in the first model building that had been constructed by Edgington. (*See* Doc. No. 36-2, p. 7).

On May 2, 2003, Edgington submitted its final payment to Miller and satisfied the final outstanding mortgage amount remaining on The Clermont Yacht Club. (*See, e.g.,* Doc.

No. 35-11).  Edgington claims that at this time, at least one of each of the seven unit types based on Miller's designs had been built and issued a certificate of occupancy.  (Doc. No. 36-2, ¶ 19).

The record is silent as to what contact, if any, the parties had between May 2003 and January 2006.  On January 20, 2006, counsel for Miller sent a "cease and desist" letter to Edgington directing it to discontinue the use of the Miller's intellectual property absent Miller's consent.  (Doc. No. 1-8).  Robert Miller's affidavit states that the letter was sent "shortly after" he discovered the alleged infringement on the part of Edgington.  (Doc. No. 3, ¶ 21).  On June 6th and 15th of 2006, Miller obtained copyright registration from the United States Register of Copyrights for the technical drawings and architectural works associated with The Clermont Yacht Club project.  (Doc. No. 3, ¶¶ 25-27; Doc. Nos. 1-13, 1-14).  After further correspondence with Edgington did not resolve the issue, Miller filed the instant lawsuit on June 26, 2006.  (*See generally* Doc. No. 1).

In its memorandum of law in support of the motion for preliminary injunctive relief, Miller argues that it has a high likelihood of proving at trial that its works were unlawfully copied by Edgington and that this showing entitles Miller to a presumption of irreparable harm.  (*See* Doc. No. 4, p. 3).  Miller further argues that a preliminary injunction is in the public interest and that the balancing of hardships does not preclude the issuance of an injunction in the instant case.  (*See id.* at pp. 3-5).  In response, Edgington argues that Miller has not met its burden of showing any of the four factors that must be demonstrated in order to obtain the requested relief, and that the hardship to Edgington if the injunction is granted far outweighs the hardship to Miller if the Court denies the motion.  Edgington states that

the project has been built and many of the units have been sold or are under contract with purchasers.  Defendant further argues that its actions with reference to the signing and sealing of plans for the project were allowed under the statutes and were not forbidden.

## Standard of Review

Generally, the purpose of a preliminary injunction is to maintain the status quo until the district court can enter a final decision on the merits of the case.  *United States v. DBB, Inc.*, 180 F.3d 1277 (11th Cir.1999).  To prevail on its request for injunctive relief, the party seeking the injunction must demonstrate the following:  (1) a substantial likelihood of success on the merits; (2) irreparable injury if the injunction is not issued; (3) that the threatened injury to the party seeking the injunction outweighs the potential damage that the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, will not be adverse to the public interest.  *E.g., Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1231 (11th Cir. 2005); *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998).  Because a preliminary injunction is an extraordinary and drastic remedy, such relief is not to be granted unless the movant clearly establishes the 'burden of persuasion' as to each of the four prerequisites.[2]  *See, e.g., McDonalds,* 147 F.3d at 1306; *Schiavo*, 403 F.3d at 1231.

---

[2]     The Eleventh Circuit has not adopted the rule set out by the Ninth Circuit, cited in Miller's memorandum of law, which states that a copyright holder is not required to make an independent demonstration of irreparable harm.  *Compare, e.g., Ferrellgas Partners, L.P. v. Barrow*, 143 Fed. Appx. 180, 190-91 (11th Cir. 2005) (per curiam), *Choppers, Inc. v. Passaro*, 159 Fed. Appx. 74, 75 (11th Cir. 2005) (per curiam) (applying the traditional standard); *with LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1155 (9th Cir. 2006) (applying the standard articulated by Miller).

A party may support its motion for preliminary injunction by setting forth allegations of specific facts in affidavits.  *See* M.D. Fla. R. 4.05(b)(2), 4.06(b)(3).  In considering a motion for preliminary injunctive relief, a district court may rely on affidavits and hearsay materials that would not be admissible as evidence for entry of a permanent injunction.  *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir.1995); *F.A.C.E. Trading, Inc. v. Famiano*, Case No. 8:05-cv-1740T23TBM, 2006 WL 571723, at *7 n. 6 (M.D. Fla. March 8, 2006).

## Analysis

### A.  Likelihood of Success on the Merits

The first and primary factor in determining whether a preliminary injunction should issue is whether the plaintiff is likely to prevail on the merits of its claims.  *Tally-Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1026 (11th Cir. 1989); *Glen Raven Mills, Inc. v. Ramada Int'l, Inc.*, 852 F. Supp. 1544, 1547 (M.D. Fla. 1994).  "It is clear from our cases that proof of a substantial likelihood of success on the merits is an indispensable prerequisite to a preliminary injunction."  *All Care Nursing Serv. v. Bethesda Mem. Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989).  To demonstrate a substantial likelihood of success on the merits, the plaintiff must make a showing of likely or probable, but not certain, success at trial.  *Schiavo*, 403 F.3d at 1232 (citing *Home Oil Co., Inc. v. Sam's East, Inc.*, 199 F.Supp.2d 1236, 1249 (M.D. Ala. 2002)).

Without expressing an opinion as to whether Miller will ultimately prevail, the Court finds that Miller has not presently demonstrated the "indispensable prerequisite" of likely success on the merits of its claims.  During oral arguments, counsel for both parties

identified three issues central to the determination of Miller's copyright infringement claim:
ownership, the existence of an implied license, and the applicable statute of limitations.  As
the record and the arguments presented by counsel demonstrate, many disputed issues of fact
remain which raise questions whether Miller is likely to succeed at trial.  The parties had
been engaged in a business venture under an informal contract before dissension began.  It
is unclear from the record what the precise agreement between the parties was and what
authorization Miller gave to Edgington for use of the designs Miller had developed.  Thus,
because many issues of fact remain, the Court declines to grant the extraordinary remedy of
preliminary injunctive relief and to disturb the status quo prior to trial.  *See, e.g.,*
*McDonalds,* 147 F.3d at 1306.

### A.  Ownership

Edgington argues in its response that Miller has not shown a likelihood of success
on the merits because Miller has not shown a *prima facie* case of ownership under federal
copyright laws.  Only the legal or beneficial owner of an exclusive right under a copyright
is entitled, subject to the requirements of 17 U.S.C. § 411, to institute an action for any
infringement of that particular right committed while he or she is the owner of the copyright.
17 U.S.C. §§ 411(a), 501(b); *Montgomery v. Noga,* 168 F.3d 1282, 1292-93 (11th Cir. 1999).
The plaintiff in a copyright infringement action normally bears the burden of proving
ownership of a valid copyright.  In order to meet this burden, the plaintiff must show that the
work is original and that the applicable statutory formalities were followed.  *See Bateman*
*v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 (11th Cir.1996).  The registration of a copyright
certificate constitutes *prima facie* evidence of the validity of a copyright in a judicial

proceeding commenced within five (5) years of the copyright's first publication.  *See, e.g.* 17 U.S.C. § 410(c).

In the instant case, Edgington argues that publication of the designs at issue took place in May of 2000, when Robert Miller sent the designs and a "revised marketing plan" to Edgington for use in the upcoming media promotions on The Clermont Yacht Club.  (*See* Doc. No. 35-1, p. 12; Doc. No. 36-2, ¶¶ 25, 27-29).   Counsel for Miller stated at oral argument that although it was likely that Miller would not be able to avail itself of the presumption of validity under Section 410(c), Miller has presented sufficient and unrebutted evidence in the form of affidavits and exhibits to demonstrate ownership.  Robert Miller's affidavit that he is the author of the drawings is unrebutted.   Furthermore, copyright certificates not filed within the five (5) year statutory period may still be submitted to the Court as probative evidence of ownership.  *See* 17 U.S.C. § 410(c).   Hence, upon review of the record, the Court concludes that Miller has demonstrated a substantial likelihood of proving valid ownership of the copyrights at trial.

### B.  Implied License and the Statute of Limitation

Although Miller has demonstrated a substantial likelihood of proving copyright ownership at trial, it has not demonstrated a substantial likelihood of success on the merits of the copyright infringement claim.  As its Response shows, Edgington has several strong defenses to Miller's claim, including implied license and the statute of limitations.

First, Edgington argues that Miller granted it an implied license to use Miller's works.  The existence of an exclusive or non-exclusive license is an affirmative defense to a claim of copyright infringement.  *See, e.g., I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir.

1996); *Home Design Serv. v. Hibiscus Homes of Florida, Inc.*, No. 6:03-cv-1860-Orl-19KRS, 2005 WL 3445522, at *12 (M.D. Fla. 2005).   A non-exclusive license in a copyrighted work may be granted orally or even implied from the conduct of the parties.  *See* 17 U.S.C. § 101; *Jacob Maxwell, Inc. v. Veeck,* 110 F.3d 749, 752 (11th Cir. 1997).  "In fact, consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing." *See I.A.E.*, 74 F.3d at 775 (citing *Pinkham v. Sara Lee Corp.*, 983 F.2d 824, 831 (8th Cir. 1992)).  An implied, non-exclusive license is granted when (1) a person (the licensee) requests the creation of a work; (2) the creator (the licensor) makes that particular work and delivers it to the licensee who requested it; and (3) the licensor intends that the licensee-requestor copy and distribute its work.  *See id.* at 776; *Atkins v. Fischer*, 331 F.3d 988, 992 (D.C. Cir. 2003).  Several objective factors guide the judicial inquiry as to whether an implied license exists: a) the language of the copyright registration certificate; b) the letter agreement, if any; c) deposition testimony; and d) the delivery of the copyrighted material without warning that its further use would constitute copyright infringement.  *See I.A.E.*, 74 F.3d at 776; *Effects Assoc., Inc. v. Cohen*, 908 F.2d 555, 558 n. 6 (9th Cir. 1990).

The record reveals that Edgington has a strong argument on the merits that Miller granted it an implied license to use Miller's designs.  There is no disagreement between the parties that Edgington hired Miller to create the designs at issue.  Miller delivered the designs to Edgington upon request.  Miller seemingly acknowledged that these designs would be distributed with regard to The Clermont Yacht Club when, *inter alia*, Robert Miller referenced the marketing plans in his initial letters to Edgington and again in his May 2005

-11-

correspondence.  (*See* Doc. No. 1-3; Doc. Nos. 35-3).  Furthermore, there is no evidence in the record that Miller included any warnings upon delivery of its work that further use of these designs would constitute copyright infringement.  Philip Edgington stated in his affidavit that it was not until January of 2006 that Miller mentioned any limitations on the use of these drawings.  (*See* Doc. No. 36-2, ¶ 22).

Although not raised in its brief, Miller contended at oral arguments that even if Edgington could prove that an implied license was granted, Edgington violated the scope of the implied license.  Miller argued that any implied license did not include the right to alter the plans and have another professional sign and use them to obtain permits.  Miller argued that it was the understanding of Robert Miller when Edgington agreed to contact him on an "as needed" basis that Miller would be "needed" if changes had to be made to the plans to obtain the requisite permits.  While Miller raises a plausible argument, it has presented insufficient evidence for the Court to conclude that it has a substantial likelihood of prevailing on the merits of this argument at trial.  Further evidence is needed to determine whether, or if, the parties intended there to be a limit to the implied license in the instant case.

Another issue of fact underscores Edgington's argument that Miller knew the designs were being used in this manner since 2000, and even if Miller did not, Miller knew or should have known at the time of the September 2001 walkthrough.  If Miller knew or should have known of the allegedly infringing conduct by 2001, its claim may be barred by the equitable doctrines of laches or equitable estoppel.  *See, e.g.*, *Home Design*, 2005 WL at *8-*9; *AmBrit, Inc. v. Kraft, Inc.* 812 F.2d 1531, 1545 (11th Cir. 1986) (laches consists

of an inexcusable delay in asserting a right or claim which prejudices the opposing party); *Dream Dealers Music v. Parker*, 924 F.Supp. 1146, 1152 (S.D.Ala.1996) (The doctrine of equitable estoppel applies in copyright cases to prevent claimants from recovering when they have acted "in a way that induc[ed] the infringer reasonably to rely upon such action to his detriment."). In addition, failing to take steps to timely revoke an implied license or to insist the licensee modify its practices to conform with the license when the licensor is aware of such conduct is evidence that the licensee is not violating the terms of its implied license. *See, e.g., Batesville Serv., Inc. v. Funeral Depot, Inc.*, 2004 WL 2750253, at *6 (S.D. Ind. 2004).

For similar reasons, Miller has not demonstrated a likelihood of success on the merits because the record reveals Edgington may have a meritorious argument that Miller's claim is time-barred. The statute of limitations for copyright infringement claims states that causes of action must be asserted within three (3) years after the claim has accrued. 17 U.S.C. § 507(b). A copyright infringement claim accrues when a plaintiff "learns, or should as a reasonable person have learned that the defendant was violating his rights." *James W. Ross, Inc. v. Cecil Allen Constr., Inc.*, No. 6:03-cv-792-ORL28KRS, 2004 WL 1146104, at *2 (M.D. Fla. Apr.26, 2004) (quoting *Gaiman v. McFarlane*, 360 F.3d 644, 653 (7th Cir. 2004), *reh'ng and reh'ng en banc denied* (7th Cir. 2004)); *see also Calhoun v. Lillenas Publ'g*, 298 F.3d 1228, 1236 (11th Cir. 2002) (Birch, J., specially concurring).

In the case at bar, if Miller knew or should have known of the infringing act in 2000 or 2001 as Edgington argues, or even in 2003 when Edgington satisfied the final outstanding

mortgage amount remaining on The Clermont Yacht Club,[3] Miller's claim would be time-barred unless it could demonstrate that the infringement was of such a recurring nature that the continuing tort kept alive the statute of limitations.[4]  *See, e.g., Smith v. Piper Aircraft Corp.*, 425 F.2d 823, 825-26 (5th Cir. 1970).  This is another example of the many issues of fact which appear at this juncture in the case and serves to make the Court hesitant to grant preliminary injunctive relief.

Care must be taken in issuing an order for preliminary injunctive relief before the entire case has been fully and fairly heard to assure that the power of the Court to require or deter action does not result in unwarranted harm to the defendant or to the public.  *See Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005).  Thus, the Court concludes that Miller has not demonstrated a likelihood of success on the merits at trial.

## B.  Irreparable Harm

The Eleventh Circuit has stated that irreparable harm or injury is " 'the *sine qua non* of injunctive relief.' "  *See, e.g. Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir.1990)).  Without a finding of a likelihood of irreparable injury, preliminary injunctive relief is improper and will be reversed on appeal.  *See id.*  In order to qualify as irreparable, harm or injury must be "actual and imminent."  *Id*. In determining whether harm is irreparable, courts consider, *inter alia*, the nature of the harm

---

[3]        *See, e.g.,* Doc. No. 35-11.

3        This lawsuit was filed on June 26, 2006.  (*See* Doc. No. 1).

alleged and the delay of the movant in seeking relief.  *See, e.g.*, *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc*., 60 F.3d 27, 39 (2d Cir.1995); *Pippin v. Playboy Entertainment Group, Inc.*, Case No. 8:02-cv-2329T30EAJ, 2003 WL 21981990, at *2 (M.D. Fla. 2003).

In the instant case, Miller's memorandum makes no separate argument that it will suffer irreparable harm should the Court fail to issue a preliminary injunction.  Miller argues that the Court should presume irreparable injury because Miller has established a *prima facie* case of copyright infringement against Edgington.  However, the Court will not presume irreparable harm where the party seeking the injunction cannot demonstrate a likelihood success on the merits.  *See, e.g., Block State Testing Serv., L.P. v. Kontractor's Prep Corp.*, 4 F.Supp.2d 1365, 1367 (M.D. Fla. 1997).  Thus, as Miller has failed to demonstrate a likelihood of success on the merits and irreparable injury, the Court will deny Miller's Motion for preliminary injunctive relief.[5]

## Conclusion

For the foregoing reasons, the Court **DENIES** the Motion for Preliminary Injunction, filed by Plaintiff R. Miller Architecture, Inc. on June 26, 2006. (Doc. No. 2).

**DONE** and **ORDERED** in Chambers in Orlando, Florida this 2nd__ day of August, 2006.

---

[5]     Because Miller has failed to satisfy the two prerequisites of the standard for granting an injunction, namely, irreparable injury and likelihood of success on the merits, the Court will not analyze its supplemental argument that an injunction meets the standard for the balance of hardship to other interested persons, or the argument that an injunction would be in the public interest.

PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record